IN RE GONZALO ARDÍN ROMÁN, Respondent.

No. 82. Argued October 14, 1953.—Decided November 30, 1953.

A. *Miranda Esteve*, R. *Martínez Álvarez, Jr.*, and A. *Miranda Cárdenas*, for respondent. *Rafael L. Ydrach Yordán*, *Assistant Fiscal of the Supreme Court*, for the People.

PER CURIAM: In a disbarment proceeding brought to us by the Assistant *Fiscal* of this Court against the attorney and notary Gonzalo Ardín Román, it is alleged, in part, that the respondent, on three different occasions, acting as notary public, certified that certain persons had signed and sworn before him three promissory notes in favor of the Savings and Loan Fund Association of the Employees of the Insular Government, without the persons actually and really having appeared before Gonzalo Ardín Román to sign those notes and without his knowing personally, nor by the act of signing before him, that the signatures were those of the executing parties. As to one of the persons who appears signing one of the promissory notes as a solidary surety, that is, as to Belén Balenciano, it is alleged in the complaint that Gonzalo Ardín Román did not actually and really know her, although he certified that he knew her personally, it being further alleged that it was not true that the person known as Belén Balenciano had signed the note in his presence or at any other place. It is further alleged in the complaint that the respondent entered those affidavits in his Registry of Affidavits; that the first of the three afore-mentioned notes involved the amount of one thousand dollars; that the aforesaid Association, "relying on the notarial attestation and signature of the respondent, gave Mr. Angel Elí Acevedo, as a loan, the amount of one thousand dollars, of which amount said Angel Elí Acevedo paid the sum of $695.33, leaving an unpaid balance of $351.92 ($304.67 principal and $47.25 interest), which the surety Ramón Pérez Díaz had to pay alone and to his prejudice because it was not true that the person known as Belén Balenciano had signed as a surety before the respondent, or at any other place, the aforesaid note"; that the second promissory note involved the amount of one thousand eight hundred dollars with interest at a rate of 6 per cent and the third involved the amount of one thousand eight hundred dollars at the rate of 6 per cent.

In his answer, the respondent admits the essential facts to the effect that the alleged makers of the promissory notes neither subscribed nor swore to the documents before him and that he neither knew nor knows Mrs. Belén Balenciano, although he so stated in the attestation clause of the note, but that he personally knew the other parties subscribing the note and that he also knew their signatures; that he phoned several of the other persons subscribing the note and they assured him on the telephone that those were their signatures; that all the signatures, with the exception of Belén Balenciano's, were authentic and legitimate; that one of the makers, as principal debtor, was an employee working at the very office of the "Employee's Association"; that one of the documents was brought to respondent office by the messenger of the office of the Association itself; that due to those reasons "respondent could never suspect on that occasion that one of the signatures might be spurious"; that the respondent was undoubtedly surprised in good faith. Respondent alleges that, as to the first promissory note, he paid the full debt immediately after he learned that Belén Balenciano's signature was not legitimate. He further states that he "has been in the practice of the notarial profession for over thirty years and has authorized more than 50,000 affidavits of all kinds and that this is the first time that due to an excess of good faith he has been surprised in his acts, having immediately remedied it within the maximum of his possibilities, without any of the persons involved in this case having been prejudiced in any manner whatsoever."

In a motion which respondent subsequently filed, he "accepts having committed the violation to the Notarial Act as charged in the complaint" but alleges the following mitigating circumstances:

"1. That the circumstances under which the documents were signed by the respondent were such, that the same thing would have happened to any Notary.

"2. That in counts number Two and Three there were no claims whatsoever inasmuch as the principal debtors paid their loans in full and that it was only in count number One of the complaint that a claim was made, and in this case the respondent was the only victim, inasmuch as he paid in full the money which the principal debtor failed to pay.

"3. That for (36) years the respondent has been in the continuous practice of his profession in this city of San Juan, and that he always tried to act as honestly as he could, so as not to have any difficulties with anyone.

"4. That the document which has caused this complaint is a promissory note in favor of the Savings and Loan Fund Association of the Employees of the Insular Government, which promissory note is subscribed by Angel Elí Acevedo (the employee) and by Ramón Pérez Díaz and Belén Balenciano as sureties. The employee, Angel Elí Acevedo, received the amount of the loan and shortly thereafter he quit work and left Puerto Rico, leaving the amount of THREE HUNDRED and odd dollars unpaid. The Employees' Association charged this amount to Ramón Pérez Díaz, one of the sureties, and making his signature good, he paid to the Employees' Association the amount left unpaid by Angel Elí Acevedo, the employee and principal debtor. Once Ramón Pérez Díaz had paid said amount he tried to obtain from the other surety the proportional share of the sum paid to the Employees' Association, and she told him that she had signed no document and that therefore she was not responsible for any debts incurred by Angel Elí Acevedo. Under the circumstances, Ramón Pérez Díaz, instead of calling the respondent and informing him of the situation, went directly to the Honorable Supreme Court without giving the respondent the opportunity to arrange the matter satisfactorily, just as he tried to do when he learned what had happened. Did Ramón Pérez Díaz act correctly? Mr. Ramón Pérez Díaz and the respondent have maintained friendly business relations for over (35) years, without those relations having ever been disturbed, wherefore he was greatly surprised when he was called by Lic. J. Rivera Barreras, then the *Fiscal,* who was the first person to inform him of the events. To conclude, I must tell you that I am the poorest attorney in the whole island; I have not a single quarter saved, and this is so, because there are nine persons who depend exclusively on me for their support and everything I earn I spend on their behalf."

470

To the motion to set aside a hearing, the respondent attached several affidavits of some of the subscribing parties of the promissory notes, ratifying the mitigating averments of the respondent. This Court rendered an order to the effect that since the respondent had admitted his violation of the Notarial Act charged in the complaint, the date set for the hearing of this proceeding was set aside, and the case submitted to the Court for decision.

There are two important factors involved in the final decision of this proceeding. On the one hand we are convinced that the respondent, in acting as he did, had no intention whatsoever of deceiving any person.

On the other hand, from an objective point of view, the act of the respondent involves a clear violation of the postulate of the notarial attestation which is the essential basis of our entire notarial system. If not adequately punished, such a violation could lead to other violations resulting in the destruction of the foundations of the Notarial Act. There is no doubt that the respondent should be punished. As to the nature and extent of the punishment to be imposed, it is our duty to consider the personal circumstances of the respondent and the subjective factors surrounding the transactions, but it is also our mission to maintain the integrity of our notarial system. The absence of bad faith on the part of the respondent is a mitigating circumstance of significance with regard to the extent of the punishment, but the performance of the act itself, an act which tends to destroy the solemn certificate of the notary, indicates that the respondent should be suspended from the practice of his profession as attorney and notary. In choosing whether the punishment should be a suspension or only a censure of his conduct, the social interest in maintaining the integrity of the foundations of the Notarial Act should prevail over the individual treatment of the respondent. Once the selection is made, the particular circumstances involved herein are of special significance in

order to determine the limits and scope of the term of suspension. The judge cannot overlook the attribute of just compassion, but neither should he sacrifice a public interest of high importance.

This case is analogous to *In re Vergne Ortiz*, 67 P.R.R. 28 where respondent was suspended from practice as an attorney and notary for three months. Considering all the circumstances of this case, respondent Gonzalo Ardín Román should be suspended from practice as an attorney and notary for the period of one month, and it is so ordered.

Mr. Justice Negrón Fernández, with whom Mr. Justice Belaval concurs, dissenting in part.

The nonobservance in good faith, as in this case, of an act of acknowledgment of a signature, in a *private document containing nothing recordable or inscribable in the Registry of Deeds*, § 39, III, of the Act to Regulate the Practice of the Notarial Profession in Porto Rico, of March 8, 1906, as amended by Act No. 389 of May 9, 1951 (Sess. Laws, p. 956),—that the document be signed before the very notary authorizing it—should not have, according to the last paragraph of § 38 of the Act, punishable consequences—disciplinary, rather—beyond the scope of the professional field itself in which it was produced; the notarial practice; and always in proportion to the reasons which led to it. Although this last circumstance has been considered, in part, by the Court, I think it is more in harmony with the law, more rational and more just to a member of our bar who has no unworthy precedent in his long practice as a notary; who did not act with the intention of deceiving; who immediately assumed civil responsibility for his carelessness, and who admitted his fault, to limit the suspension to his practice of the notarial profession solely. The fault, serious as it is, in the practice of the notarial office, does not imply moral turpitude, nor does it involve collusion, or fraud. Under these circum-

stances, the suspension as notary exclusively, seems to be more in harmony with the law and so effective for the disciplinary purpose of the statute, that I cannot concur with the majority in also suspending the respondent from the practice of law.